## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| EDGE BUSINESS SYSTEMS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. _____ |
| JEFFREY KRAMER, and ATLANTA OFFICE TECHNOLOGIES, INC., | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## COMPLAINT

1.     This case is about Defendants' unauthorized use and misappropriation of EDGE Business Systems, LLC's confidential business information and trade secrets to illegally poach EDGE customers and prospective customers. Defendants' direct access to and use of EDGE's confidential business information violated both state and federal laws prohibiting the unauthorized access to computer systems and the use and disclosure of confidential information and trade secrets. Defendants are thus liable to EDGE for monetary damages to be proven at a jury trial, EDGE's attorneys' fees incurred in bringing this lawsuit, and punitive damages.

## Parties, Jurisdiction, and Venue

2.      EDGE is a small business in Roswell, Georgia. It is a locally owned, independent dealer of hardware and software solutions to other businesses. EDGE concentrates its business in leasing printers, copiers, and scanners to other businesses in and beyond the metro Atlanta region. EDGE is a Georgia limited liability company headquartered at 1350 Northmeadow Parkway, Roswell, Georgia 30076, which is also its principal place of business. EDGE's members all reside in this District.

3.      Defendant Atlanta Office Technologies, Inc. ("AOT") is a Georgia corporation, and its principal place of business is located at 5600 Oakbrook Parkway, Suite 260, Norcross, Georgia, 30093.

4.      AOT is a direct competitor of EDGE, as both sell printer, copier, and scanner equipment to other businesses in and beyond the metro Atlanta region.

5.      Defendant Jeffrey Kramer is an individual residing in Fulton County, Georgia.

6.      On or around September 1, 2017, Mr. Kramer became a salesperson and partner (a minority owner) at AOT.

7.      Mr. Kramer has been a sales representative and partner at AOT from September 1, 2017 through the present.

8.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States.

9.     Personal jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in this judicial district.

## Factual Background

10.     EDGE previously hired non-party Christopher Schwarzer as its Vice President of Finance in May 2016.

11.     In that role, Schwarzer was provided login credentials (a username and password) to electronically access by using a computer network EDGE's customer and prospective customer information through an online portal maintained by a third party, Great America Financial Services a/k/a Great America Leasing.

12.     EDGE uses Great America Leasing as its preferred provider for the financing by its customers of equipment sold and leased by EDGE.

13.     Great America Leasing's portal allows EDGE to input and track offers to prospective customers, renewal offers to existing customers, and the contract terms and contact information for its prospective and existing customers.

14.     EDGE's customer information included, among other things: customer identities and contact information, customer contracts, lease and

sales terms for equipment, potential customer leads, and other sensitive and confidential business information.

15.     This customer information was not publicly available, and it was protected by, among other things, unique usernames, and passwords that EDGE provides its employees.

16.     EDGE has and has at all relevant times a policy prohibiting employees from sharing their login credentials with anyone, or otherwise accessing EDGE customer and prospective customer information unless for the employee's official duties.

17.     Schwarzer's employment with EDGE ended on May 2, 2017.

18.     On May 8, 2017, Schwarzer signed a Separation Agreement and General Release with EDGE, which required Schwarzer to protect any trade secrets or confidential EDGE information that he learned during his employment with EDGE.

19.     The Separation Agreement stated that Schwarzer had access to trade secrets, including EDGE customer names, customer contact information, and customer contract terms.

20.     This Separation Agreement also specifically contemplated that Schwarzer would return all login credentials and not disclose any trade secrets of EDGE or his login credentials to any third parties.

21.    EDGE also requested that Great America Leasing terminate Schwarzer's login credentials.

22.    A few years after Schwarzer's employment ended, EDGE began hearing from its customers that they were being directly and aggressively solicited by Kramer and AOT.

23.    At first, EDGE did not have reason to think that Kramer and AOT were improperly soliciting EDGE's customers, or doing anything that might be actionable.

24.    But by 2021, it became apparent to EDGE based on communications from some of its customers that Kramer's and AOT's solicitations were not normal competition.

25.    For example, an EDGE customer reported that Kramer had bragged in January 2021, that he had personally "replaced 16 EDGE clients over the last 4 months" because EDGE customers were "overcharged" under their contracts with EDGE.

26.    Another EDGE customer reported that Kramer and AOT were so aggressive in a personal visit to the customer's place of business that Mr. Kramer was told to leave, and the front desk staff was instructed to call the police if he returned.

27.     But this was not before AOT and Mr. Kramer attempted to poach that EDGE customer by stating that he could save them 20-30% off what they were paying to EDGE.

28.     By 2021, EDGE learned from certain of its customers that Kramer was soliciting EDGE customers with specific details about the customers' contracts with EDGE, including when the lease term ended and the payoff amount.

29.     Kramer and AOT even offered to satisfy the customer's remaining lease obligation if the customer leased new equipment through AOT.

30.     Based on these reports from customers, EDGE began investigating how Kramer may have gained access to this confidential information about EDGE's customers and their contract terms.

31.     What EDGE's internal investigation ultimately discovered in early 2022 was that Schwarzer's old login credentials for the Great America Leasing Portal were used to repeatedly access EDGE client information from late 2017 through March 2022 and run reports on EDGE customers and lease terms during that time.

32.     EDGE took immediate steps to revoke Schwarzer's login credentials to the Great America Leasing portal, which EDGE believed to have been revoked upon Schwarzer's separation of employment from EDGE back in May 2017.

33.     Because Schwarzer's post-employment access or provision of his login credentials to third parties violated his Separation Agreement, EDGE filed a AAA arbitration against Schwarzer.

**The AAA Arbitration Between EDGE and Schwarzer**

34.     On July 28, 2022, EDGE initiated a AAA arbitration against Schwarzer under the Separation Agreement.

35.     In the arbitration, EDGE sought discovery from Kramer and AOT regarding their solicitation of EDGE customers and use of EDGE's confidential customer information as it was AOT showing up on the doorsteps of EDGE customers purporting to know those customers' contract terms and expiration dates.

36.     The AAA issued document subpoenas to Mr. Kramer and AOT on October 27, 2022, which each responded to on December 12, 2022.

37.     Over the next few months, Kramer and AOT produced limited documents.

38.     One key set of documents produced by Kramer was a string of text messages between he and Schwarzer.

39.     These texts showed that Schwarzer met with Kramer in December 2020, and at that meeting, Schwarzer provided Kramer a thumb drive containing about 194 pages of information.

40.     In subsequent correspondence with Kramer's and AOT's separate counsel, both admitted that the thumb drive contained EDGE's customer contact information, lease terms, and lease expiration dates.

41.     With this admission, EDGE sought to depose Kramer and AOT's Chief Executive Officer William Schmidt to determine what was specifically provided by Schwarzer to Kramer and AOT and how that information was used by Kramer and AOT.

42.     On February 27, 2023, the AAA issued subpoenas for depositions of both Kramer and Schmidt.

43.     Both refused to comply with those subpoenas.

44.     This required EDGE to file an action in the Fulton County Superior Court (Case No. 2023CV377438) on March 14, 2023 seeking to compel compliance with the AAA deposition subpoenas.

45.     After briefing and oral argument on the matter, the Fulton County Superior Court granted EDGE's request on July 25, 2023, ordering Kramer and Schmidt to sit for their depositions.

46.     EDGE took Kramer's deposition on August 23, 2023, and Schmidt's deposition on October 4, 2023.

47.     At their depositions, both Kramer and Schmidt admitted that Kramer had received EDGE customer information from Schwarzer, used that

customer information to send out about 100 emails soliciting EDGE clients, and received responses to some of those emails.

48.    Despite those admissions, both Kramer and Schmidt claimed, under oath, that they did not make any sales as a result of that information, and that upon Schmidt learning that Kramer and AOT had used that confidential information improperly obtained from EDGE via Schwarzer, that Schmidt instructed all such information destroyed.

49.    In follow up correspondence with AOT's counsel, AOT further claimed that not only was the underlying confidential information destroyed (the customer lists, contract terms, and other information), but they also claimed that each of the 100 email solicitations that AOT admits to sending out to EDGE customers and all responses to those emails were also destroyed.

50.    EDGE deposed Schwarzer on October 19, 2023.

51.    In his deposition, Schwarzer admitted for the first time that Kramer and AOT have, for years now, intentionally obtained and used EDGE's confidential information through the Great America Leasing portal to improperly solicit and poach EDGE customers.

52.    Schwarzer testified that sometime in September 2017, after Schwarzer's employment with EDGE ended, Kramer contacted Schwarzer about access to EDGE's confidential business information.

53.    At a meeting in September 2017, Kramer asked Schwarzer for inside information about EDGE.

54.    Schwarzer responded that he did not have this information because that information was all on computers of EDGE and stored electronically in the Great America Leasing portal.

55.    Kramer then asked Schwarzer to attempt to log in to the Great American Leasing portal for Kramer and to give Kramer any EDGE information he could access.

56.    Although Schwarzer believed that all of his login credentials were terminated, Kramer asked him to attempt to log in anyway.

57.    Schwarzer initially declined, but Kramer kept pushing, and repeatedly asked Schwarzer to "just check," that it was "no big deal," and because Kramer was "curious" to see if the login credentials were terminated.

58.    After much urging from Kramer, Schwarzer attempted to log in to the Great America Leasing portal.

59.    To Schwarzer's surprise, his login credentials still worked.

60.    Schwarzer then contacted Kramer, who asked Schwarzer to log in to the Great America Leasing Portal and run reports showing all EDGE customers that had contracts expiring within one year and the terms of those customers' contracts.

61.    Schwarzer again first refused, but Kramer insisted.

62.    Kramer asked Schwarzer to do him a "favor" and do him a "solid" by running the reports, and again stated that it was "really no big deal."

63.    Schwarzer finally relented.

64.    Schwarzer again logged in and ran the reports specifically requested by Kramer, which produced hundreds of pages of data on EDGE's customers with contracts expiring within one year.

65.    Even though Kramer claimed to Schwarzer that it was "no big deal," Kramer specifically instructed Schwarzer not to email any of the reports to Kramer or to discuss them in any written or electronic communications between them.

66.    Instead, Kramer told Schwarzer to print hard copies of the reports and to give those to Mr. Kramer in person.

67.    The two met for lunch soon after, and Schwarzer gave Kramer the hard copies of the reports, which amounted to about 250 pages and contained information about all of EDGE's customers with contracts expiring within one year.

68.    Schwarzer also wrote down his login credentials to the Great America Leasing portal on the front page of the hard copy reports when he provided those reports to Kramer.

69.    According to Schwarzer, the reason that Kramer requested and needed the EDGE customer information was because Kramer had recently (as

of September 1, 2017) moved from Sharp Business Systems to AOT, and Kramer was under a customer non-solicitation agreement from Sharp that prevented him from selling to his previous customer list.

70.     With no customers of his own, EDGE's customer list for contracts up for renewal within the next year was an especially fertile hunting ground for Kramer to solicit while he was under a restrictive covenant with Sharp.

71.     Indeed, in his deposition, Kramer admitted to directly soliciting and taking EDGE clients, although he claims he did so without the use of any confidential information obtained from Schwarzer.

72.     After Kramer received the reports from Schwarzer in September 2017, he used those reports to solicit those specific EDGE customers with contracts coming up for renewal (the printer and copier contracts at issue are multi-year deals) on behalf of himself and AOT.

73.     Kramer used this information to specifically undercut EDGE contract pricing, claim that EDGE was gouging and overcharging its customers, claim that EDGE had unscrupulous business practices, and that based on the information he had, Kramer and AOT could also buy out the remaining lease terms for EDGE's customers.

74.     About a year after Schwarzer provided Kramer the first tranche of reports detailing EDGE customers with contracts expiring within a year in September 2017, Kramer went back to the well a second time.

75.     In or about September 2018, Kramer again asked Mr. Schwarzer to access EDGE customer information on the Great America Leasing portal and to run new reports for him and AOT that listed EDGE customers with contracts expiring within the next year (Sept. 2018 – 2019).

76.     Schwarzer accessed the Great America Leasing portal, ran those reports, printed them out, and provided those printouts to Kramer when the two met for lunch in the fall of 2018.

77.     The volume of these reports again amounted to between 200-300 pages.

78.     Again Kramer and AOT used this information to target and solicit EDGE customers with the same tactics listed above.

79.     In November 2020, Kramer went back to Schwarzer for a third time, to ask Schwarzer to again run reports detailing EDGE customers with contracts expiring within a year.

80.     This time Schwarzer did not want to print out the information, so he put the reports on a thumb drive for Kramer.

81.     Kramer again asked Schwarzer not to send anything by email.

82.     In December 2020, Kramer and Schwarzer met again and Schwarzer gave Kramer the thumb drive.

83.    Although the two were careful not to send any of the EDGE information over email, they did discuss the EDGE information and their plan to meet in person for lunch to exchange the information.

84.    During the December 2020 meeting, Kramer bragged that taking EDGE clients was "easy" when he was armed with the information that Schwarzer provided detailing EDGE client contract terms and pricing and dates for renewal.

85.    Following the meeting in December 2020, Kramer again used that information to solicit and take EDGE clients consistent with his tactics described above.

86.    Kramer's last attempt to go back to the well was in in the spring of 2022.

87.    In or around March of April 2022, Kramer asked Schwarzer for a fourth time to again access the Great America Leasing portal and run reports for customers with contracts expiring within a year.

88.    This time, however, Schwarzer declined.

89.    Schwarzer told Kramer that he had given Kramer enough information, and if Kramer wanted the EDGE information and reports he should use the login credentials Schwarzer provided and do it himself.

90.    In or around March or April 2022, Kramer directly accessed the Great America Leasing portal, ran similar reports for EDGE customers with

contracts expiring within a year, and downloaded that information to use to solicit EDGE customers.

91.    It was shortly after this time in the spring of 2022, that EDGE's own investigation from customer complaints revealed that Schwarzer's login credentials were still active, which were promptly shut off by Great America Leasing at EDGE's renewed request.

92.    As a result of Kramer's and AOT's actions in inducing Schwarzer to provide EDGE confidential information, and their subsequent use of that information to solicit and take EDGE customers, EDGE has suffered significant monetary damages.

93.    During all the relevant events above, Kramer was acting in his capacity as an employee and partner of AOT.

94.    Kramer's actions in asking Schwarzer to access and download EDGE information from the Great America Leasing portal and subsequently receiving and using that information was to the benefit of AOT.

95.    AOT and its partners also had actual knowledge of Kramer's acts in using EDGE confidential information.

96.    Kramer specifically told Schwarzer that his AOT partners knew of the stolen confidential information: "Well, they [the AOT partners] know about it cause we talk about it in the weekly meetings we have.  And they basically said, Don't tell me anymore. Just sell."

97.   AOT and its partners were happy to benefit from Kramer's actions and sales for years even though AOT knew he was improperly and illegally competing and obtaining sales with stolen information.

98.   Schwarzer did not receive direct cash payments in exchange for providing the confidential EDGE client information to Kramer and AOT.

99.   Yet Schwarzer did receive other things of value from Mr. Kramer and AOT.

100.   For example, Kramer provided Schwarzer with a free TV, free golf outings, free tickets to sporting events, other comped events, and free meals.

101.   As a result of all of this, EDGE has suffered significant monetary damages in lost revenue and other economic damages, which they seek to recover here.

### Count I – Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA")

102.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

103.   The CFAA provides a civil cause of action where a defendant has (1) accessed a protected computer without authorization; or (2) exceeded authorized access on a protected computer. 18 U.S.C. § 1030(a)(2)(c); 18 U.S.C. § 1030 (a)(4).

104. Kramer accessed a protected computer network (the Great America Leasing Portal) without authorization to do so via Schwarzer's login credentials that Schwarzer first provided to Kramer in September 2017 and again in March or April 2022.

105. At all relevant times, Kramer was acting in his capacity as an employee-agent of AOT and as a partner and owner in AOT in improperly accessing EDGE's confidential customer information through a protected computer network on the Great America Leasing portal.

106. Moreover, AOT knew that Kramer was accessing and using confidential EDGE customer information, even directing Kramer to "Just sell" in response to hearing about the way he was selling to EDGE customers based on stolen information.

107. Therefore, AOT is also liable under CFAA.

108. EDGE suffered a monetary loss of far greater than the $5,000 jurisdictional threshold under the CFAA because of this unauthorized access and due to Defendants' actions.

**Count II – Conspiracy to Violate the CFAA**

109. EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

110. 18 U.S.C. 1030(b) creates a separate offense for attempting or conspiring to violate the CFAA. Such a claim requires evidence of an

agreement and common activities in furtherance of the unlawful act in violation of the CFAA.

111.   Kramer and AOT conspired with Schwarzer to violate the CFAA via Kramer, on behalf of himself and AOT, asking for and inducing CFAA violations through the use of Schwarzer's Great America Leasing portal credentials to log in and obtain EDGE confidential information several times.

112.   Schwarzer, Kramer, and AOT had a common agreement and overt activity in furtherance of CFAA violations by meeting multiple times to further CFAA violations and exchanging physical and electronic documents in furtherance of the conspiracy.

113.   Moreover, although Schwarzer did not receive direct cash payments for the EDGE confidential information, Kramer and AOT provided Schwarzer with other material benefits and things of value, including a TV, paid for sports outings and other events, and meals. All these exchanges are overt acts in furtherance of the conspiracy.

114.   Therefore, Kramer and AOT are separately liable for a conspiracy to violate CFAA.

## Count III – Violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA")

115.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

116.   The DTSA creates a private cause of action for an owner of a trade secret that is misappropriated if the trade secret relates to a product or service used in, or intended for use in, interstate or foreign commerce.

117.   Under the DTSA, prohibited misappropriation includes both the acquisition of a trade secret and its disclosure.

118.   EDGE is an owner of trade secrets—its customer information and customer lease information—that is kept on secure computer networks, and those trade secrets concern EDGE's customers, prospective customers, products, and services used in interstate commerce.

119.   Kramer and AOT violated the DTSA when they misappropriated EDGE's trade secrets by acquiring those trade secrets from Schwarzer, who obtained this information through unauthorized access to the Great America Leasing portal and their own unauthorized access.

120.   Kramer and AOT knew that any access by Schwarzer, who was no longer an employee or agent of EDGE, of EDGE's information on the Great American Leasing portal was unauthorized.

121.   Kramer and AOT also independently violated the DTSA when they then used the trade secrets of EDGE to solicit customers and potential customers of EDGE with the knowledge that the trade secrets were improperly acquired.

122.   Kramer and AOT used those trade secrets by impermissibly soliciting EDGE customers and potential customers with direct reference to the customers' or potential customers' lease terms.

123.   EDGE was damaged by Defendants' violations of the DTSA in an amount to be determined by a jury.

### Count IV – Violations of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-761 et seq. ("GTSA")

124.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

125.   EDGE's customer and prospective customer information, including customer identity, equipment provided, lease terms and pricing, are trade secrets because this information has economic value that is not generally known.

126.  EDGE took reasonable efforts to maintain the secrecy of this information by keeping it password protected, and prohibiting EDGE employees from disseminating that information or sharing their passwords or login credentials.

127.  AOT and Kramer misappropriated EDGE's trade secrets by acquiring EDGE's customer and prospective customer information and lease terms by asking Schwarzer to run reports on EDGE customers and directly accessing that information.

128.   EDGE was damaged by Defendants' misappropriation of EDGE's trade secrets in an amount to be determined by a jury.

## Count V – Violations of the Georgia Computer Systems Protection Act, O.C.G.A. § 16-9-90 ("GCSPA")

129.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

130.   Kramer and AOT are liable for "computer theft" under the GCSPA because they used a computer network in accessing EDGE customer information with knowledge that their use was without the authorization to do so.

131.   Kramer and AOT further acted with the intention of taking or misappropriating EDGE's customer information.

132.   Kramer and AOT are also liable for "computer trespass" under the GCSPA because they used a computer network with the knowledge that such use was without authority and intending to remove EDGE's customer data from a computer or computer network.

133.   EDGE was damaged by Defendants' violations of the GCSPA in an amount to be determined by a jury.

## Count VI – Tortious Interference with Contract of Existing Customers

134.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

135.   EDGE had valid and enforceable written contracts with each of its customers that AOT and Kramer interacted with.

136.   AOT and Kramer engaged in improper and non-privileged action by, *inter alia*, telling EDGE's customers that EDGE had "overcharged for numerous agreements" and that other EDGE customers "knew something wasn't right" with the EDGE contracts and terms.

137.   AOT and Kramer engaged in improper and non-privileged action by misrepresenting the terms of EDGE's customer contracts by stating, among other things, that EDGE customers would not be responsible for certain equipment return fees and other costs to induce EDGE customers to breach their contracts and instead use AOT's and Kramer's services.

138.   As noted above, EDGE's customer contracts and terms were not publicly available and not provided by EDGE customers or EDGE to AOT.

139.   AOT and Kramer engaged in improper and non-privileged action by explicitly bad mouthing and disparaging EDGE and certain of its principals by stating, among other things, that all EDGE does "is scam people to buy equipment" from EDGE.

140.   AOT and Kramer engaged in improper and non-privileged action by engaging in aggressive, in-person tactics to induce EDGE customers to breach their contracts with AOT, resulting in at least one occasion of an EDGE

customer instructing its staff to force Kramer and AOT out of the door, with instructions to call the police if Kramer and AOT returned.

141.   Indeed, Kramer explicitly told some EDGE customers that they were free to "break" their contracts with EDGE and he would help them do so.

142.   Kramer even contacted Great American Leasing falsely representing that he was specific EDGE customers in an attempt to obtain additional information directly from Great American Leasing.

143.   Due to persistent calls from Kramer misrepresenting himself as an EDGE customer, Great American Leasing notified its customer representatives not to accept calls from Kramer's cellphone number.

144.   AOT's and Kramer's tactics went far beyond what is normal competitive conduct in the marketplace.

145.   AOT's and Kramer's actions were not negligent; these tactics were intentional and for the purpose of inducing EDGE customers to breach their contracts with EDGE and to end their on-going business relationships with EDGE.

146.   AOT's and Kramer's actions caused financial injury to EDGE in an amount to be proven at trial because certain EDGE customers breached their contracts or otherwise ended their on-going business relationships with EDGE.

## Count VII – Tortious Interference with Business Relationships of Prospective Customers

147.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

148.   EDGE had a valid and legitimate business interest in prospective business relationships with potential customers contained in the trade secret information disclosed to and obtained by AOT and Kramer.

149.   The potential and prospective customers that EDGE had identified were reasonably likely to develop given the identification of those customers by EDGE, including their business needs in the marketplace and identity, absent interference from AOT and Kramer.

150.   AOT and Kramer engaged in improper and non-privileged conduct based on the same or similar conduct described in Count VI above.

151.   AOT and Kramer solicited and interfered with those prospective customers and business relations of EDGE based on the trade secret information that AOT and Kramer misappropriated.

152.   AOT's and Kramer's actions were not negligent; these tactics were intentional and for the purpose to induce prospective EDGE customers to forgo a business relationship and contracts with EDGE.

153.   AOT's and Kramer's actions caused financial injury to EDGE in an amount to be proven at a jury trial because those prospective customers declined to enter contracts and business relationships with EDGE.

## Count VIII – Attorneys' Fees

154.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

155.   The GTSA grants a fact finder the ability to award reasonable attorneys' fees where willful and malicious appropriation exists. O.C.G.A. § 10-1-764.

156.   Kramer and AOT have also acted in bad faith, have been stubbornly litigious, and have caused EDGE unnecessary trouble and expense.

157.   Kramer and AOT are also therefore liable to EDGE for its attorneys' fees and expenses under O.C.G.A. § 13-6-11.

## Count IX – Punitive Damages

158.   EDGE incorporates by reference paragraphs 1 through 101 above as if fully set forth herein.

159.   Kramer's and AOT's tortious acts and omissions described above demonstrate, by clear and convincing evidence, that their actions showed willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care that would raise the presumption of conscious indifference to the consequences.

160.   EDGE is thus entitled to recover punitive damages from Kramer and AOT under O.C.G.A. § 51-12-5.1.

WHEREFORE, EDGE prays for the following relief:

i.   Issue a summons to all Defendants;

ii.   Hold a jury trial on all triable issues;

iii.   Find for EDGE and against Defendants on each of the claims;

iv.   Award EDGE monetary damages, including pre- and post-judgment interest;

v.   Award EDGE its reasonable attorney's fees and expenses incurred;

vi.   Award EDGE punitive damages against Defendants; and

vii.   Such other relief that the Court determines appropriate.

Respectfully submitted, this 15th day of November, 2023.

**FELLOWS LABRIOLA LLP**

*/s/ Steven M. Kushner*
Steven M. Kushner
Georgia Bar No.: 430510
skushner@fellab.com
Maxwell R. Jones
mjones@fellab.com
Georgia Bar No.: 451289

Suite 2400, Harris Tower, Peachtree Center
233 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
(404) 586-9200

*Counsel for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing was prepared consistent with the type and font requirements of Local Rule 5.1(B) and 7.1(D).

This 15th day of November, 2023.

**FELLOWS LABRIOLA LLP**

*/s/ Steven M. Kushner*
Steven M. Kushner
Georgia Bar No.: 430510
skushner@fellab.com
Maxwell R. Jones
mjones@fellab.com
Georgia Bar No.: 451289

Suite 2400, Harris Tower, Peachtree Center
233 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
(404) 586-9200

*Counsel for Plaintiff*